IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAHMAL SAAID WILLIAMS,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **NO. 25-CV-2974** |
| | : | |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| *Defendants* | : | |

**M E M O R A N D U M**

NITZA I. QUIÑONES ALEJANDRO, J.                                      JULY 1, 2026

    *Pro se* Plaintiff Jahmal Saaid Williams commenced this civil action alleging he was subjected to unconstitutional conditions of confinement while he was housed as a pretrial detainee at Curran Fromhold Correctional Facility ("CFCF"). Williams's Third Amended Complaint (ECF Nos. 25 and 28 ("TAC")) is the operative pleading in this case. Currently before the Court is the Motion to Dismiss for Failure to State a Claim filed by Defendants the City of Philadelphia and former Philadelphia Department of Prisons Commissioner Blanche Carney (ECF No. 32) (the "Motion") and Williams's response (ECF No. 42 ("Pl.'s Resp.")). As set forth below, the Motion will be denied. Williams will proceed to discovery on his claims against Defendant Supervisor YesCare and the claims against Commissioner Carney and the City of Philadelphia that remain.

**I.        PROCEDURAL HISTORY**[1]

    Williams initiated this civil action on June 9, 2025, against the City of Philadelphia, Blanche Carney, Supervisor YesCare, and YesCare Medical Department. (ECF Nos. 1 and 2.) By Order dated June 30, 2025, the Court[2] granted Williams's request to proceed *in forma pauperis*,

---

[1] The Court adopts the sequential pagination supplied by the CM/ECF docketing system to the filings in this case.

[2] This matter was reassigned to the undersigned on October 30, 2025. (ECF No. 21.)

screened the initial Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), and dismissed Williams's claims alleging that he was denied constitutionally adequate living conditions and medical care at CFCF. (ECF No. 5.) Williams's claims against Carney in her official capacity were dismissed with prejudice as duplicative of the claims against the City. (*Id.* at 9-10.) All other claims were dismissed without prejudice pursuant to § 1915(e)(2)(B)(ii) for failure to state a claim. (*Id.*) Williams was given leave to file an amended complaint. (*Id.* at 10.)

After Williams filed an Amended Complaint (ECF No. 6), the Court directed service and terminated "Yes Care Medical Department" as a Defendant because it was not named in the Amended Complaint. (*See* ECF Nos. 7, 9.) The City and Carney moved to dismiss the Amended Complaint, (*see* ECF No. 16), while Defendant Supervisor YesCare filed an Answer, (*see* ECF No. 20). In response, Williams filed a Second Amended Complaint. (ECF No. 22.) Because the Second Amended Complaint failed to properly name defendants and failed to include all of the factual allegations, the Court granted Williams leave to file a third amended complaint. (*See* ECF No. 23.) Williams subsequently filed the TAC, which is the operative pleading in this case. (*See* ECF Nos. 25 and 28.)[3]

## II.    FACTUAL ALLEGATIONS

Williams alleges in the TAC that his due process rights were violated as a pretrial detainee at CFCF because he was housed in unsanitary and overcrowded conditions that caused him to fall ill, and he was denied medical care. He contends Carney[4] was responsible for creating a system that housed inmates in overcrowded conditions in unsanitary rooms without proper plumbing, and

---

[3] The TAC was mailed to the court in two parts and entered on the docket at ECF Nos. 25 and 28. Defendant Supervisor, Yes Care filed an Answer to the TAC on December 22, 2025. (*See* ECF No. 30.)
[4] In the TAC, Williams refers to Carney at times as the Warden of CFCF. (*See, e.g.*, ECF No. 25 at 2, 4.)

the medical supervisor of Yes Care created a system in which medical staff took over thirty days to respond to medical calls because inmates were not taken seriously.  (ECF No. 25 at 4.)  Williams asserts that he fell ill due to the conditions to which he was exposed, and that medical assessment and treatment were delayed, further exacerbating his illness.  (ECF No. 28 at 1.)

Williams alleges as follows:  Beginning in April 2024, he was housed at CFCF on Unit C24 in "multipurpose closet two (M2)" with three other inmates due to overcrowding conditions at the facility.  (ECF No. 25-1 at 1, 2.)  Williams fell ill "around August of 2024" and started submitting medical calls in September 2024.  (*Id.* at 5.)  According to Williams, it took more than ninety days to receive basic medical care such as a check of his heart rate, pulse, and weight.  (*Id.* at 2.)  He was eventually hospitalized from December 26, 2024, until January 26, 2025.  (*Id.* at 1, 5.)  Williams was diagnosed with aspergillosis, a lung infection caused by exposure to poor ventilation, damp environment, inadequate lighting, and moldy conditions.[5]  (*Id.* at 5.)

Williams alleges that his illness was caused by Carney's policy or custom of housing four inmates in a room that was originally designed as a storage closet and which had no windows, inadequate lighting, and poor ventilation, as well as a leaky toilet which caused damp and moldy conditions.  (*Id.* at 1-2.)  According to Williams, over time, inmates plugged the leaking toilet with various towels and rags resulting in mold on the floors and walls of the closet, and the light had been covered with "years of newspaper" because it was otherwise very bright when lit.  (*Id.* at 1-2, 7.)  Additionally, the ventilation was inadequate because inmates plugged the vents with toothpaste and tissues for "years and years."  (*Id.* at 5-7.)

Williams contends that the moldy conditions resulted from the overcrowding and caused his illness.  (*Id.* at 3-5, 7.)  According to Williams, the room in which he was housed was designed

---

[5] Williams states that aspergillosis has an incubation period of several weeks to six months, which demonstrates that his illness was caused by the mold exposure at CFCF.  (*See* ECF No. 25-1 at 5.)

to store cleaning supplies, not humans, and it was difficult to maintain sanitary conditions in the room with four inhabitants. (*Id.* at 3, 7.) Williams contends that there were four multipurpose rooms per unit that housed inmates and, because these rooms were not originally designed to be occupied by inmates, the plumbing was inadequate. (*Id.* at 2.) He states that "[t]hese 16 inmates[,] 4 from each storage room caused an imbalance" within the units and increased the facility population by fifteen to twenty percent, and that Carney failed to adequately adjust prison resources despite the increased number of inmates listed on the prison census reports. (*Id.* at 3-4.)

Williams verbally "voiced concerns to officers" regarding the cell conditions, including "the mold growing in his cell," and filed grievances requesting to be moved to a cell with one cellmate, as opposed to three. (*Id.* at 6; ECF No. 28 at 1.) He further asserts that the Commissioner was aware that inmates were housed in the closets, at least in part because he filed grievances on the issue,[6] and prior lawsuits addressed the overcrowding issues at the facility. (ECF No. 25-1 at 3, 7.)

In September 2024, Williams began submitting sick call requests due to excessive coughing. (*Id.* at 1.) He alleges he was refused proper medical evaluation and treatment on multiple occasions from September 2024 to December 2024. (*Id.*) For example, he filed sick calls in September 2024, and after thirty days, was given Robitussin. (*Id.* at 6, 9.) He submitted additional sick calls, "proclaiming the Robitussin was not working." (*Id.*) In November, Williams was taken to the medical unit and the doctor on duty refused to send him to the hospital, even though Williams explained that he had lost twenty pounds since falling ill. (*Id.* at 6.) Williams states that he filed sick calls, grievances, met with a Lieutenant regarding the lack of treatment,

---

[6] Williams attached three grievances to the TAC. (ECF No. 28 at 8-10.) He states that Carney failed to address the grievances, (*see, e.g.*, ECF No. 25-1 at 3), and that he appealed "each grievance to the highest degree," (Pl.'s Resp. at 3).

4

and was escorted by corrections officers on numerous occasions to the medical department because he was spitting up mucus, blood, and food. (*Id.* at 1-2, 6, 9.) Williams was told by "medical doctors of record" that it would be "a waste" to send him to the hospital. (*Id.* at 2.) Williams claims the medical department did not properly evaluate him until December 26, 2024, at which point he weighed 120 pounds, an almost forty-pound weight loss since the last weight check of record. (*Id.* at 1.) Williams was hospitalized from December 26, 2024, until January 26, 2025, and upon discharge, was admitted to the infirmary unit of another City jail, where he remained until November 2025. (*Id.*) He alleges that, at the time of the filing of the TAC in December 2025, he continued to suffer the effects of the infection. (*Id.* at 4; ECF No. 28 at 1.)

Based on these allegations, Williams presents federal constitutional claims pursuant to 42 U.S.C. § 1983. He seeks monetary damages as relief. (*See* ECF No. 28 at 1.) The City and Carney have moved to dismiss the TAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[7] (Mot. at 2-14.)

## III.   STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the allegations contained in the complaint. Fed. R. Civ. P. 12(b)(6); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

---

[7] Williams checked the box on the relevant portion of the form TAC to indicate that he intends to present claims against Carney in her official capacity, (*see* ECF No. 25-1 at 2), and the City and Carney have moved for dismissal of the official capacity claims, (*see* Mot. at 9). However, this was unnecessary. By Order dated June 20, 2025, the Court conducted a statutory review of the initial Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), and dismissed any official capacity claims against Commissioner Carney as indistinguishable from, and duplicative of, the claims against the City. (*See* ECF No. 5 at 7 (citing, *inter alia*, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).)

*Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation marks and citations omitted).  The Court affords a liberal construction to factual allegations when a complaint is filed by a self-represented litigant.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

## IV.    DISCUSSION

With respect to the federal constitutional claims against the moving Defendants, Williams alleges that his due process rights were violated while he was detained at CFCF because the prison housed inmates in overcrowded conditions, in unsanitary rooms without proper plumbing, and consequently, he was exposed to mold and contracted a lung infection due to that exposure.  Since Williams was a pretrial detainee at the time of the events at issue, the Fourteenth Amendment governs his conditions-of-confinement claims.  *See Hubbard v. Taylor*, 399 F.3d 150, 165-66 (3d Cir. 2005).    Prison officials have a constitutional duty to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quotation marks and citation omitted).  To establish a basis for a Fourteenth Amendment violation, a pretrial detainee must allege that his conditions of confinement amount to punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979); *Camps v. Giorla*, 843 F. App'x 450,

452 (3d Cir. 2021) (*per curiam*) ("[A] court must determine whether the conditions complained of were imposed for the purpose of punishment or whether it is merely incidental to a legitimate governmental objective.").

"Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "The objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (cleaned up). To satisfy the subjective component of the analysis, a prisoner generally must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *see also Wilson v. Burks*, 423 F. App'x 169, 173 (3d Cir. 2011) (*per curiam*) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial harm exists, and he must also draw that inference." (quoting *Farmer*, 511 U.S. at 837)). Courts "look at the totality of the conditions" in assessing conditions-of-confinement claims. *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990); *see also Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (stating that in assessing whether conditions amount to unconstitutional punishment of detainees, courts "consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time" (citations omitted)).

The presence of toxic mold in a prison may violate the Constitution, and satisfy the objective analysis of the test, if it poses a substantial risk of serious harm. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) (holding that inmates should not be "expose[d] to [contaminants] that pose an unreasonable risk of serious damage to his future health"); *Johnson v. Beard*, No. 09-0886, 2014 WL 4793905, at *6 (M.D. Pa. Sept. 25, 2014) ("Toxic mold which causes [an] inmate to

7

suffer headaches, sinus problems, blurred vision, breathing difficulty, irritated eyes and fatigue can[ ] set forth a viable conditions of confinement claim.") (citation omitted); *cf. Hall-Wadley v. Maintenance Dep't*, 386 F. Supp. 3d 512, 518 (E.D. Pa. 2019) ("Without any allegation as to suffering actual physical harm from the mold, which is required to state his federal claim, Plaintiff's conditions of confinement claim regarding the black mold . . . lacks constitutional muster." (footnote omitted)).    Williams alleges that the overcrowding resulted in unsanitary conditions, including mold, and that exposure to the mold caused his illness, which required hospitalization and subsequent care.    Taking these allegations as true, Williams has satisfied the objective component of the Fourteenth Amendment conditions-of-confinement analysis. However, the Court must also determine whether Williams has sufficiently alleged that the named Defendants acted with a "sufficiently culpable state of mind." *See Wilson*, 501 U.S. at 298.

### A.    *Monell* Claims Against the City of Philadelphia

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Local governments and municipalities are considered persons under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  However, a municipality, such as the City of Philadelphia, is not vicariously liable under § 1983 for the actions of its employees on a theory of *respondeat superior*.  *See id.* at 691; *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (stating "local governments are responsible only for 'their *own* illegal acts'" (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986))).

There are two ways for a § 1983 claim against a municipality to proceed: "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or

that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation marks and citations omitted). "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). "[I]t is not necessary for a plaintiff to establish affirmative acts: 'deliberate indifference, lack of compliance and failure to adhere to . . . standards' may also constitute custom." *Swainson v. City of Philadelphia*, No. 22-2163, 2023 WL 144283, at *5 (E.D. Pa. Jan. 10, 2023) (quoting *A v. Nutter*, 737 F. Supp. 2d 341, 362 (E.D. Pa. 2010)). "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries." *Est. of Roman*, 914 F.3d at 798 (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)). This can be done "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged. *Id.* (citation omitted). A plaintiff whose claim is predicated on a failure or inadequacy must allege a failure that amounts to deliberate indifference on the part of the municipality. *Forrest*, 930 F.3d at 106 (citation omitted). "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).

The City argues that Williams's *Monell* claim fails because he has not identified an unconstitutional policy promulgated by the City, and because he has not alleged any facts to support a plausible inference that his alleged constitutional violations were the result of a municipal custom. (*See* Mot. at 10-11.) The City also contends that Williams refers to his personal experiences only and does not assert that there is a widespread practice of housing inmates in overcrowded or unsanitary conditions.[8] (*Id.* at 11-12.) The Court disagrees.

Throughout the TAC, Williams alleges that the prison had a policy or custom of housing inmates in multipurpose rooms; the multipurpose rooms were not originally designed as cells, but as storage closets; these rooms were overcrowded, housing four inmates; there were four multipurpose rooms used as cells per unit, resulting in a 10-15% increase in the facility population; the overcrowding of each multipurpose room caused unsanitary conditions and an overwhelmed plumbing system in the multipurpose rooms, of which the City and Commissioner were aware; mold grew on the floor and walls due to the leaky toilet, inadequate lighting, and poor ventilation; Williams became ill and was diagnosed with a lung infection that is caused by exposure to mold; Williams was hospitalized for one month and detained in an infirmary unit for eleven months upon discharge from the hospital; and he continued to suffer the effects of the lung infection at the time of the filing of the TAC. The Court further understands Williams to allege that the prison's practice of housing four inmates in multipurpose rooms on each unit at CFCF was widespread and that other prisoners were affected as well. In essence, Williams alleges that the prison's policy or custom of housing four inmates in multipurpose rooms that were not originally designed as cells caused overcrowding, which resulted in unsanitary conditions, and which violated his

---

[8] Movants also argue that Williams has failed to plausibly allege medical deliberate indifference claims against Carney and the City. (*See* Mot. at 11-14.) However, the Court does not understand Williams to present such claims in the TAC.

constitutional rights and injured him.  Taking these allegations as true, as the Court must at this stage of the litigation, Williams has plausibly alleged a *Monell* claim against the City.[9]  *See, e.g., Little v. Dauphin County*, No. 24-2169, 2025 WL 2797154, at *4 (M.D. Pa. Sept. 29, 2025) (denying motion to dismiss *Monell* claim), *reconsideration denied*, 2025 WL 3296309 (M.D. Pa. Nov. 26, 2025); *Godson*, 2025 WL 1970251, at *6 (denying motion to dismiss conditions of confinement *Monell* claim against City of Philadelphia where plaintiff alleged custom of overcrowding, inadequate staffing, and failing to implement adequate sanitation and hygiene practices that caused spread of MRSA through prison and caused plaintiff to contract MRSA).

B.      **Individual Capacity Claims against Former Commissioner Carney**

To state a § 1983 claim, a plaintiff must allege how each defendant was personally involved in the events and occurrences giving rise to the claims brought against that defendant.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  "A plaintiff makes sufficient allegations of

---

[9] "While policy and custom claims and failure or inadequacy claims are closely related, 'the avenues remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected.'" *Godson v. City of Philadelphia*, No. 24-6461, 2025 WL 1970251, at *5 (E.D. Pa. July 16, 2025) (quoting *Forrest*, 930 F.3d at 106).  However, "[a] plaintiff is not obligated to plead with special particularity the exact policies and practices that were in place, prior to taking any discovery into the alleged policies, and explain exactly how these precisely alleged policies caused or contributed to [an individual's] injuries." *Williams v. City of Philadelphia*, No. 24-3068, 2025 WL 1758618, at *4 (E.D. Pa. June 25, 2025) (quoting *Reed v. City of Philadelphia*, 2021 WL 2529915, at *3 (E.D. Pa. June 17, 2021)).  Indeed, "[m]unicipal liability under § 1983 'is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside his or her personal knowledge.'" *Crosland v. City of Philadelphia*, 676 F. Supp. 3d 364, 380 (E.D. Pa. 2023) (quoting *3909 Realty LLC v. City of Philadelphia*, No. 21-030, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021)); *see id.* (finding plaintiff had pled sufficient facts for *Monell* claim to survive motion to dismiss under either "policy or custom" theory or "failure to train, discipline, or supervise" theory)); *see also Harbaugh v. Bucks County*, No. 20-1685, 2022 WL 16722333, at *4 (E.D. Pa. Nov. 4, 2022) ("Even if, for sake of argument, Plaintiff were required to identify a specific policymaker to establish an affirmative policy, this would not preclude Plaintiff from proceeding on failure to train and failure to supervise theories.  All in all, a jury is permitted to find *Monell* liability if [the relevant entity] 'turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights' such that '[unnamed] policymaker[s,] can reasonably be said to have been deliberately indifferent to the need.'  Plaintiff need not identify the specific municipal policymaker to prove it." (first citing *Forrest*, 930 F.3d at 105-06; then quoting *Parkell v. Danberg*, 833 F.3d 313, 338 (3d Cir. 2016))).

11

a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode*, 845 F.3d at 1207). "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Id.* (citation omitted).

"Allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020). Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)). Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).

There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)

(alteration in original)).[10]  "Courts recognize that liability under § 1983 may be imposed on an official with final policymaking authority if that official establishes an unconstitutional policy that, when implemented, injures a plaintiff."  *Chavarriaga*, 806 F.3d at 223 (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).  "[T]o establish a claim against a policymaker under § 1983 a plaintiff must allege and prove that the official established or enforced policies and practices directly causing the constitutional violation."  *Id.* (citing *Sample*, 885 F.2d at 1114); *see also Beers-Capitol v. Whetzel*, 256 F.3d 120, 133-34 (3d Cir. 2001) (same).  The second way a supervisor may be personally liable for unconstitutional acts taken by subordinates is if "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Barkes*, 766 F.3d at 316.

Defendants argue that the claims against Carney should be dismissed because Williams has failed to plead facts that plausibly establish Carney's personal involvement in the alleged constitutional violation.  (Mot. at 6-8.)  Defendants state that Carney was no longer Commissioner when Williams was at CFCF, relying upon a City of Philadelphia press release dated April 8, 2024, announcing the appointment of Michael R. Resnick as the next Commissioner of the Philadelphia Department of Prisons.  (*See id.* at 6 & n.1.)  They also allege that Williams's allegations of Carney's involvement are conclusory and speculative.  (*Id.* at 7-8.)  The Court is not persuaded by Defendants' arguments.

Reading the TAC as a whole, the Court understands Williams to primarily advance a policy, practice, or custom theory of supervisory liability against Carney on the conditions-of-confinement claim.  Specifically, Williams alleges that Commissioner Carney established the

---

[10] "Failure to" claims, such as a failure to train, failure to discipline, or failure to supervise, are generally considered a subcategory of policy or practice liability.  *Barkes*, 766 F.3d at 316-17 (citation omitted).

practice of housing inmates in rooms originally designed for the storage of cleaning supplies, the rooms were overcrowded with four inmates, there was poor ventilation and inadequate, leaky plumbing which caused mold on the floor and walls in the room in which he was housed, and he developed a lung infection as a result of exposure to the mold and other conditions. Taking Williams's allegations as true as the Court must at this stage of the proceedings, Williams's claim of supervisory liability against Carney based on a policy/custom theory is adequately pled. *See, e.g.*, *Cordero v. Nwachukwu*, No. 23-0373, 2026 WL 1678250, at *5 (D.N.J. June 10, 2026) (finding plaintiff had adequately alleged policy/practice supervisory liability on Eighth Amendment deliberate indifference claim against the Commissioner of the NJDOC where plaintiff alleged NJDOC has custom of saving money by denying prisoners access to medical specialists and treatment, the Acting Commissioner is responsible for the development, promulgation, and implementation of policies, procedures, and standards for correction facilities within the NJDOC, and Acting Commissioner had knowledge of the custom and failed to correct the issue through training or discipline); *Peele v. Delaney*, No. 12-4877, 2017 WL 467347, at *3-4 (E.D. Pa. Feb. 3, 2017) (denying motion to dismiss claims based on overcrowding where plaintiff sufficiently pled that warden of prison was responsible for policy at issue and had knowledge of and acquiesced in the policy).

While Williams repeatedly refers to "policy" and "custom" in the TAC, he also alleges that Carney was aware of the overcrowding issues through the census reports, "numerous class action lawsuits," and grievances he filed. (*See, e.g.*, ECF No. 25-1 at 3.) He further alleges that Carney oversaw the daily operations of the facility and failed to address the unsanitary conditions when brought to her attention. (*See, e.g.*, *id.* at 4, 5.) It is possible that Williams seeks to advance, or advance in the alternative, a failure or inadequacy theory of liability. Courts have found similar

14

allegations plausible at the pleading stage. *See, e.g.*, *Rogers v. Mears*, No. 22-596, 2025 WL 3199161, at \*6 (D. Del. Nov. 17, 2025) (denying motion to dismiss where plaintiff alleged, *inter alia*, that he filed grievances, made sick calls, and was suffering serious symptoms, and that Warden had responsibility for all activity with the prison because plaintiff had plausibly alleged that the Warden had knowledge of mold conditions and he acted unreasonably to abate the conditions); *Gibbs v. Carney*, No. 20-1301, 2025 WL 3199161, at \*5 (D. Del. Aug. 25, 2022) (denying motion to dismiss supervisory liability claim where plaintiffs plausibly alleged that Warden knew of serious risk of COVID yet was deliberately indifferent to it).  While it is unlikely that Carney could be liable on a theory that she was directly involved in, had knowledge of, or failed to supervise others responsible for Williams's housing and medical care after she left her position with the City, William's allegations that she was responsible for a policy, practice, or custom that was adopted or established during her tenure was the cause of Williams's injuries is a plausible basis for his claim.

Accordingly, the Court will deny Defendants' motion to dismiss Williams's claim against Carney, and it will proceed for further factual development.  Defendants can reassert this issue at the summary judgment stage of these proceedings, if appropriate.

## V.    CONCLUSION

For the foregoing reasons, the Court will deny the Motion.  For the sake of clarity, the Court reiterates that Williams's official capacity claims against former Commissioner Carney have already been dismissed with prejudice and the Court does not read the TAC to raise medical deliberate indifference claims against former Commissioner Carney or the City of Philadelphia. Williams's supervisory liability claims against former Commissioner Carney and *Monell* claims

against the City of Philadelphia will proceed to discovery. An order follows, which directs the City and former Commissioner Carney to respond to the remaining claims in this case.


*NITZA I. QUIÑONES ALEJANDRO, J.*